## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:20-CR-103-PPS-JEM |
| | ) | |
| FRANKLIN DE LaROSA-CASTILLO, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

Defendant, Franklin De LaRosa-Castillo, was pulled over for driving 94 mph in a

70 mph zone.  After some discussion, he gave the officer who stopped him consent to

search his car, and drugs were found.  De LaRosa-Castillo now seeks suppression of the

drugs that were seized during that search, as well as suppression of several statements

he made prior to being read his *Miranda* rights.  [DE 22.]  For the reasons fully explained

below, I conclude the search was proper because there was voluntary consent to search

the vehicle after a lawful traffic stop supported by probable cause.  Additionally, the

statements made by De LaRosa-Castillo before he was subjected to custodial

interrogation are also admissible.  However, I will suppress one statement made by De

LaRosa-Castillo before he was read his *Miranda* rights – which is "she doesn't know

anything about it," because by the time he made that statement, De LaRosa-Castillo was

in custody and being subjected to custodial interrogation.

### Background

Defendant De LaRosa-Castillo is currently charged with one count of possession

with intent to distribute cocaine, although I'm told in the briefing that the substance in question was later tested to be fentanyl.  De LaRosa-Castillo has moved to suppress evidence seized during a search of the car he was driving on I-80 on August 11, 2020.

The entire roadside encounter, lasting 2 hours and 18 minutes, was captured by two cameras – one on the dashboard of the police car and the other from an officer body camera.  [DE 23, 29.]  The dashcam video is located on the front of Portage Police Officer James Eagan's car and faces the front exterior, and contains sound from a microphone inside the squad car.  The body camera was on Sgt. Eagan's body, and captures additional audio which cannot be heard on portions of the dash camera video - including Sgt. Eagan's initial approach to the vehicle, his conversations with De LaRosa-Castillo's wife (who remained in the car for an extended period of time), and a conversation between De LaRosa-Castillo and Sgt. Eagan that occurred right after the drugs were found.

Because all material matters germane to the present motion were captured on audio and video, a hearing to decide what happened is unnecessary.  The relevant facts of the encounter are uncontested. Here's what the videos reveal: At approximately 6:17 a.m. on August 11, 2020, Portage Police Officer James Eagan saw a blue Honda Accord speeding down Interstate 80, going 94 mph in a posted 70 mph zone.  When the car passed Sgt. Eagan, he noticed the driver was male.  Eagan pulled out and activated his emergency lights and got behind the Accord.  The Accord swayed in the lane but eventually came to a stop on the shoulder.  Something odd happened next raising the

suspicions of Officer Eagan.  The male driver was hastily climbing into the backseat of the car, and the female passenger climbed into the driver's seat.

Sgt. Eagan was obviously concerned with the bizarre furtive movements inside the car, and, as a result, he drew his firearm as he approached the passenger side of the vehicle and yelled "get out of the car!"  He attempted to open the passenger door with the gun still in his other hand, pounded on the window once, pointed his finger at the occupants inside, and ordered De LaRosa-Castillo out of the car.  De LaRosa-Castillo then climbed into the front passenger seat and exited from that door.  At this point, Sgt. Eagan put handcuffs on De LaRosa-Castillo and conducted a pat down search.  De LaRosa-Castillo explained he was driving because he had to take the wheel as his wife was feeding their child.  There were two children in the backseat of the car—one was an infant.  De LaRosa-Castillo explained that he didn't have a driver's license, which was why he had climbed into the backseat when he got pulled over.  Sgt. Eagan then removed the handcuffs.  According to the body camera, De LaRosa-Castillo was handcuffed for less than two minutes.  De LaRosa-Castillo's wife handed Sgt. Eagan some paperwork.

When De LaRosa-Castillo and Sgt. Eagan walked back towards his squad car, De LaRosa-Castillo was not handcuffed and Eagan did not put his hands on him.  In fact, Sgt. Eagan told him he didn't need to keep his hands behind his back.  De LaRosa-Castillo walked on his own volition to the front passenger door of the squad car, opened it himself, and sat down in the police car.  Once seated, De LaRosa-Castillo

started to apologize to Sgt. Eagan.  Sgt. Eagan said, "I thought you had a gun or something man!"  De LaRosa-Castillo answered that he didn't have a gun, and in response to Sgt. Eagan's question, "So you just don't have a license?" De LaRosa-Castillo answered, "no, I don't."

The two proceeded in a conversation in a friendly tone, free from threats or any aggression.  De LaRosa-Castillo again explained that the baby was crying, so he took the wheel to drive so his wife could feed the baby.  The two continued talking—about how to spell De LaRosa-Castillo's last name, what was his date of birth, where he was traveling to, why he just visited Chicago, and whose vehicle he was driving.  Sgt. Eagan learned that De LaRosa-Castillo was originally from the Dominican Republic, he lived in Massachusetts, and they were returning from a vacation in Chicago.  Although English is not De LaRosa-Castillo's first language, it is evident from the recordings that he speaks the language fluently and understood Sgt. Eagan during the entire exchange.

Sgt. Eagan then left the squad car for a few minutes to speak with De LaRosa-Castillo's wife, Yulisa Duran. Although Duran's answers are soft and difficult to decipher over the body camera, Sgt. Eagan repeats many of her responses back to her to confirm.  She told him that De LaRosa-Castillo was not in the country legally and that they had gone to Chicago to visit someone.  Sgt. Eagan asked for her consent to search the vehicle, and although her response cannot be heard on the bodycam recording, Sgt. Eagan indicates that she said yes.

Before searching the car, Sgt. Eagan returned to the vehicle to talk with De

LaRosa-Castillo some more.  Sgt. Eagan said he was not with Immigration and asked De LaRosa-Castillo if there was anything illegal in the car like drugs or large amounts of cash.  De LaRosa-Castillo answered no to all of these questions.  Sgt. Eagan then asked, "can I search the vehicle?" and De LaRosa-Castillo immediately replied, "yeah, of course."  De LaRosa-Castillo remained in the car, not handcuffed, when the search was conducted.

Sgt. Eagan began his search in the passenger compartment of the vehicle, and then moved to the trunk.  Inside the trunk there was a suitcase and inside the suitcase, a red shoe box.  Sgt. Eagan opened the shoe box and found yet another box for a Microban scale.  Before he opened that container, De LaRosa-Castillo opened the door to the squad car and got out of the police car, yelling "Sir, that's mine, that's mine."  Sgt. Eagan asked, "what is it?"  While De LaRosa-Castillo was standing by the side of the police car, separated by a number of feet from the officer, he said "it's something illegal."  Sgt. Eagan then walked swiftly back to the passenger side of his squad car, where De LaRosa-Castillo was still standing, repeatedly asking in a loud, demanding voice, "what is it?" over and over.  De LaRosa-Castillo responded that it was weed.  As he was getting back in the police car, handcuffed, De LaRosa-Castillo said, "It's mine, she doesn't know about it, she doesn't know shit."  Sgt. Eagan then went back to the vehicle's trunk, finished searching the box, and uncovered a package that looked like a brick of narcotics.

When Sgt. Eagan returned to the car again, he confirmed that De LaRosa-Castillo

understood him and that he had been treated fairly throughout the stop, and De LaRosa-Castillo agreed. Sgt. Eagan then read De LaRosa-Castillo his *Miranda* rights. When asked if he wanted to waive his rights and answer questions, De LaRosa-Castillo answered "no." At that point, Sgt. Eagan then stated, "I don't want to get hurt, I'm not looking to incriminate you here - is that fentanyl?" and De LaRosa-Castillo responded it wasn't fentanyl, but it was cocaine.

Other officers proceeded to arrive on the scene. De LaRosa-Castillo remained in the squad car, largely by himself, for a significant amount of time as the officers figured out how to proceed with the baby, child, and wife—all whom were ultimately released at the scene. The dash camera remained on for the quiet transport ride to the Porter County jail. Once in the carport, Sgt. Eagan told De LaRosa-Castillo the reason for the traffic stop, told him he was going 94 mph, and issued a warning for speeding.

### Discussion

First, let's cover what is not at issue in this case. The government has agreed that all statements made by De LaRosa-Castillo in response to questions posed by the police *after* he was read his *Miranda* rights are inadmissible. This includes De LaRosa-Castillo's statement that the substance was cocaine.[1]

What *is* at issue is the admissibility of the drugs seized from the car and several statements made by De LaRosa-Castillo when he was sitting in the police car, before he

---

[1] The substance field-tested positive for the presence of cocaine, but, as mentioned above, DEA laboratory results showed that it contained 1020 grams of Fentanyl. [DE 26 at 6 n.2.]

6

was read his *Miranda* rights including: De LaRosa-Castillo's statement that he doesn't

have a license; the statement that the car belonged to his cousin; his admission that he is

not in the United States legally; and in response to Sgt. Eagan's question "what is it?"

when he found the substance in the trunk, the responses that it was De LaRosa-

Castillo's, it was illegal, and his wife didn't know anything about it.  [DE 22 at 3-4.]  The

government bears the burden of proving by a preponderance of the evidence that the

defendant consented to a search.  *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir.

2018).

De LaRosa-Castillo has requested an evidentiary hearing on this matter.  [DE 22

at 18.]  A district court is not required to conduct an evidentiary hearing on every

motion to suppress.  The Seventh Circuit has explained that, "[a] defendant seeking an

evidentiary hearing on a motion to suppress must provide sufficient information 'to

enable the court to conclude that a substantial claim is presented and that there are

disputed issues of material fact which will affect the outcome of the motion.'"  *United

States v. Juarez*, 454 F.3d 717, 719-20 (7th Cir. 2006) (citing *United States v. Coleman*, 149

F.3d 674, 677 (7th Cir. 1998)).  In order to justify relief, motions to suppress must be

"sufficiently definite, specific and non-conjectural" and must be "detailed enough to

enable the court to conclude that a substantial claim is presented and that there are

disputed issues of material fact which will affect the outcome of the motion."  *Coleman*,

149 F.3d at 677 (citing *United States v. Rollins*, 862 F.2d 1282, 1291 (7th Cir. 1988)).  The

Court "must conduct such a hearing 'only if evidence on an issue of fact is necessary to

the decision of the motion.'" *Rollins*, 862 F.2d at 1291 (quoting *Nechy v. United States*, 665 F.2d 775, 776 (7th Cir. 1981)).  Defendant requested the hearing, so he "[bears] the burden of showing that there were disputed issues of material fact necessitating an evidentiary hearing." *Id.* De LaRosa-Castillo has failed to meet this burden.  Because I have viewed footage from both the body camera and the dashcam, there is no disputed issue of material fact and no additional evidence is needed.

## I.    Admissibility of the Drugs Recovered From the Vehicle Search

Let's start with the validity of the search first.  Defendant does not dispute that there was reasonable suspicion for the initial stop of his vehicle.  After all, he was traveling at a high rate of speed far in excess of the speed limit.  The Fourth Amendment grants protection to individuals from unreasonable searches and seizures, and all automobile stops are subject to "the constitutional imperative that [they] not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 809-10.  This includes even a minor traffic violation. *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011) ("When a police officer reasonably believes that a driver has committed a minor traffic offense, probable cause supports the stop.").  Here, Sgt. Eagan observed (presumably by a radar gun) the car traveling 94 mph in a posted 70 mph zone.  This easily constitutes a traffic violation for which an individual could be pulled over. *See* Ind. Code § 9-21-5-2 (prohibiting operation of vehicle in excess of 70 mph on highways).

So the next question is whether voluntary consent was given to search the vehicle. This is a somewhat unusual circumstance because two people were asked if the police could search the car—both the defendant and his wife. Let's turn to De LaRosa-Castillo first since he is the defendant and his consent was audibly recorded. While warrantless searches are *per se* unreasonable under the Fourth Amendment, it is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Garcia*, 897 F.2d 1413, 1419 (7th Cir. 1990) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The government bears the burden of proving, by a preponderance of the evidence, that the consent was freely given. *Id.* While the government's position would have been stronger if Sgt. Eagan had told De LaRosa-Castillo he could refuse the search, it is well settled that police officers are not required to inform an individual that he may refuse to consent to the search. *See United States v. Drayton*, 536 U.S. 194, 206-70 (2002) (citing *Schneckloth*, 412 U.S. at 227).

To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent. *United States v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001); *United States v. Cole*, 195 F.R.D. 627, 631 (N.D. Ind. 2000). Factors in assessing voluntariness include, but are not limited to: the defendant's age, education, and apparent intelligence; whether the defendant was advised of his constitutional rights; how long he was detained before he gave his consent; whether the consent was immediate or prompted by repeated requests by the authorities; the

presence of physical or subtle coercion; and whether the person was in police custody when he gave his consent. *United States v. McGraw*, 571 F.3d 624, 629 (7th Cir. 2009); *see also Raibley*, 243 F.3d at 1075-76. These factors are reviewed in the light of "objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that voluntary consent could not be given." *United States v. Grap*, 403 F.3d 439, 445 (7th Cir. 2005).

In considering all of these factors together, the clear conclusion that I reach is De LaRosa-Castillo freely and voluntarily consented to the search of his vehicle. De LaRosa-Castillo concedes that his age, education and intelligence are of a quality typically sufficient for voluntary consent. [DE 22 at 16.] Although English is not his first language, De LaRosa-Castillo demonstrated his proficiency of the language during his lengthy and detailed conversation with Sgt. Eagan, and he was able to understand and appropriately answer all of the officer's questions. When Sgt. Eagan specifically asked De LaRosa-Castillo if he understood him, he answered affirmatively. He was detained for approximately seventeen minutes before the search took place, which I don't think was an unreasonable amount of time especially since Sgt. Eagan spent some of that time trying to calm De LaRosa-Castillo's wife and child. Sgt. Eagan talked to De LaRosa-Castillo in a respectful and friendly manner, using no threats or any coercion at all. In fact, he told De LaRosa-Castillo several times that he was not Immigration and would not be calling anyone from Immigration. There was no threat of calling a drug-sniffing dog, or getting a warrant. De LaRosa-Castillo was only handcuffed for a few

minutes at the beginning of the encounter, when Sgt. Eagan did a safety pat down, and then he remained uncuffed for the remaining time before the search (including when Sgt. Eagan asked for consent). Sgt. Eagan asked only once if he could search the car, and De LaRosa-Castillo immediately replied, in an almost enthusiastic manner, "yeah, of course." Based on the objective facts known to Sgt. Eagan, he could reasonably conclude that De LaRosa-Castillo freely and voluntarily consented to the search of the vehicle. *See, e.g., United States v. Cyprian*, No. 2:06-CR-2 PS, 2006 WL 1994515, at *5 (N.D. Ind. July 14, 2006) (finding roadside consent to search vehicle after traffic stop was voluntary where "[g]uns were not drawn; no threats were made; voices were not raised; and the atmosphere was a calm one.").

De LaRosa-Castillo argues that the consent was not voluntary because it was the product of duress or coercion. He points to the fact that De LaRosa-Castillo is not a United States citizen. The determination of voluntary consent does not depend on a single controlling factor, but considers "all the surrounding circumstances." *Schneckloth*, 412 U.S. at 229. It is true De LaRosa-Castillo is not a United States citizen. But I am hard pressed to see how that fact has any great bearing on the voluntariness of his consent. What is important is proficiency with the English language and whether he had a complete understanding of the situation. On this more salient point, Defendant claims in his reply brief that "De LaRosa-Castillo had difficulty understanding Eag[a]n" and Sgt. Eagan had to repeat himself and reword his questions multiple times. [DE 31 at 4.] I've listened to both the dashcam and the bodycam videos each multiple times. It is

true that De LaRosa-Castillo answered a few questions with a "hm?" and then Sgt.

Eagan repeated the questions.  But then De LaRosa-Castillo answered all of the

questions.  They spoke for over 10 minutes, and sometimes the radio was going off in

the background.  My overall conclusion, after listening to the entirety of their

conversation, is that De LaRosa-Castillo plainly understood, and has a sufficient grasp

of the English language, so that he was able to answer Sgt. Eagan's questions in an

intelligent and understandable fashion.

De LaRosa-Castillo also makes much of the fact that Sgt. Eagan pointed his

firearm at him and handcuffed him at the beginning of the encounter.  But this was only

for a brief period of time at the start of the traffic stop, after Sgt. Eagan witnessed the

outlandish behavior of De LaRosa-Castillo climbing into the back seat, and then instead

of getting out of the car from that door, climbing back into the front passenger seat and

then exiting the vehicle.  As I discuss later in this opinion, Sgt. Eagan had an objectively

reasonable fear that De LaRosa-Castillo may have possessed a weapon.  Because the

consent to search was given much later in time, after the situation had stabilized, I don't

think it was a product of duress or coercion.  De LaRosa-Castillo also faults Sgt. Eagan

for not returning the registration or his identification prior to asking for his consent to

search the vehicle.  But De LaRosa-Castillo also did not request these documents, and

simply not returning paperwork does not seem coercive to me.  Taking all of these

factors into consideration, I'm still left with the unmistakable conclusion that De

LaRosa-Castillo gave voluntary consent to search the vehicle.[2]

## II.    Admissibility of Statements Made Before The *Miranda* Warning

Let's turn to the specific statements made by De LaRosa-Castillo before he was given his *Miranda* rights, which he seeks to suppress.  Recall that he wants to suppress his admission that he does not have a license, that the car belonged to his cousin, that De LaRosa-Castillo is not a legal resident of the United States, and the statements that the substance belonged to him, it was something "illegal," and his wife knew nothing about it.  [DE 22 at 3-4.]  De LaRosa-Castillo argues these statements were the result of a custodial interrogation absent *Miranda* warnings.  [DE 22 at 9.]  De LaRosa-Castillo believes the investigatory stop exceeded its lawful purpose and ripened into a de facto arrest at the very beginning, when he was briefly placed in handcuffs—and he remained in custody, subject to interrogation, during the entire incident.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Fifth Amendment requires that, before police officers interrogate a suspect in custody, they must warn the suspect of his right to remain silent and right to an attorney.  This *Miranda* warning isn't required for all interactions between suspects and officers—only when the suspect is "in custody" and subject to "interrogation.*"  United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996); *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016).  "[T]he essential element of a custodial interrogation is coercion."  *United States v.*

---

[2] Because De LaRosa-Castillo's consent was valid, I need not decide whether his wife also consented to the search although it certainly appears that she had the apparent authority to consent and did in fact do so.

13

*Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998) (quotation omitted).

A person is "in custody" when he is arrested or when there is a "formal arrest or a restraint of movement on his . . . freedom of movement of the degree associated with a formal arrest." *Patterson*, 826 F.3d at 455.  To determine whether a person is in custody, we use an objective test of whether a reasonable person under the same circumstances would have felt free to leave.  *Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004).  Factors that could be significant in determining if someone is in custody include: whether the suspect has been told they are free to refrain from answering questions; whether there has been prolonged, coercive, or accusatory questioning; whether the police have employed subterfuge to induce self-incrimination; the degree of police control over the environment; and whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed.  *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996).

In this case, every step of this incident was proper, and, contrary to De LaRosa-Castillo's argument, did not result in a "de facto arrest."  Due to the inherent risks of an officer approaching a vehicle on the side of the road, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures." *Maryland v. Wilson*, 519 U.S. 408, 412 (1997) (quotation omitted); *see also United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005).  Once outside of a stopped vehicle, the Supreme Court has also held it is proper for a person to be

14

patted down for safety reasons if the officer reasonably concludes that the driver might be armed and dangerous. *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977). Sgt. Eagan placed De LaRosa-Castillo in handcuffs during the pat down, which, while somewhat unusual, is completely permissible to ensure the safety of the officer. *See Jewett v. Anders*, 521 F.3d 818, 824-25 (7th Cir. 2008). This was especially justified given De LaRosa-Castillo's frantic movement inside the car when he was being pulled over.

Here, Sgt. Eagan witnessed the vehicle traveling 94 mph on the highway, and when pulled over, the driver launched himself into the backseat and the passenger came over to the driver's seat, and then, to top it all off, when Sgt. Eagan demanded that De LaRosa-Castillo exit the car, he moved back into the front passenger seat before leaving through the front passenger door. All of this movement of passengers between seats could certainly be viewed (to say the least) as being suspicious and would reasonably lead to a conclusion that the driver might be reaching for a weapon or concealing a weapon, and could be armed and dangerous. Thus, putting De LaRosa-Castillo into handcuffs for a brief period of time during the pat down was also utterly reasonable.

De LaRosa-Castillo argues that Eagan's own words show it was unreasonable for him to believe that De LaRosa-Castillo could possibly be armed. [DE 31 at 2.] When he got De LaRosa-Castillo out of the car and briefly handcuffed him, Sgt. Eagan said, "is your license suspended or something, is that why you jumped out of the driver's seat?" Moreover, De LaRosa-Castillo claims he could not exit the vehicle from the back seat,

15

because he would have had to climb over one of his children. [DE 31 at 2.] Officers can conduct a pat down search to determine whether the person is carrying a weapon "if the officer has an articulable suspicion that the subject is armed and dangerous." *United States v. Carlisle*, 614 F.3d 750, 755 (7th Cir. 2010). Importantly, the inquiry is an objective one. *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (finding frisk was supported by an articulable suspicion "even if [the officers] did not subjectively fear [the defendant] was armed when they announced that they intended to frisk him, because the legitimacy of their search stemmed at all times from whether a protective frisk for weapons was objectively reasonable under the circumstances"). Here, the pat down was objectively reasonable where Sgt. Eagan had seen the driver climb into the back passenger seat, and then climb back up to the front seat to exit the car. More to the point, in addition to his questioning about De LaRosa-Castillo's license, Sgt. Eagan specifically told him when they got in the squad car that he thought De LaRosa-Castillo might have had a gun, so there is evidence that he subjectively believed he could have been armed.

While De LaRosa-Castillo argues that Sgt. Eagan drawing his weapon and handcuffing him at the inception of the traffic stop placed De LaRosa-Castillo in custody for the entire chain of events that followed, the case law does not support this conclusion. *See, e.g., United States v. Shoals*, 478 F.3d 850, 853 (7th Cr. 2007) ("The cases are clear, however, that police officers do not convert a *Terry* stop into a full custodial arrest just by drawing their weapons, *see United States v. Askew*, 403 F.3d 496, 508 (7th

Cir. 2005); *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004), or handcuffing the subject, *see United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004); *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994)). Even if De LaRosa-Castillo could have been considered to be "in custody" during those initial two minutes that he was handcuffed, none of the statements he seeks to suppress were made during this time frame. [DE 22 at 3-4.] *See United States v. Swan*, 842 F.3d 28, 31-32 (1st Cir. 2016) (finding person previously handcuffed was not entitled to *Miranda* warning because "the situation became non-custodial by the time that the questioning began" and that "we focus on the time that the relevant statements were made.").

After the somewhat heated start to this encounter, things calmed down very quickly and became totally civil. Sgt. Eagan asked Ms. Duran to roll down the back window so that he could reassure the boy in the back seat that, "Everything's ok, buddy. OK? I promise. I'm a good guy. Your dad's ok, ok? He just made a mistake." As Sgt. Eagan and De LaRosa-Castillo started walking to the squad car, Sgt. Eagan told De LaRosa-Castillo he didn't have to keep his hands behind his back. De LaRosa-Castillo started apologizing when the two of them got in the squad car, and Sgt. Eagan explained in a calm manner, that it was fine now, and that he thought he had a gun or something at the beginning.

It is well established that as part of a traffic stop, police can ask "a moderate number of questions" and request identification from the vehicle's occupants. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). The *Berkemer* court rationalized that:

17

> The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda.

*Id.* at 440. The court reasoned that the brevity of the detention, the fact that it usually takes place in public view where people passing by either on foot or in other cars can witness the interaction, and that a detained motorist is typically confronted by only one policeman "further mutes his sense of vulnerability." *Id.* at 438. "Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made.*" United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004). Officers can ask the defendant to take a seat in the police vehicle while they are performing their duties and asking questions. *See, e.g., United States v. Muriel*, 418 F.3d 720 (7th Cir. 2005).

If the motorist is later subjected to some kind of treatment that renders him "in custody," then he is entitled to his *Miranda* rights. For *Miranda* to come into play, a defendant has to be subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks and citation omitted). It seems obvious to me that De LaRosa-Castillo wasn't placed into custody until after he jumped out of the squad car, protesting that the stuff in the trunk was his, and Sgt. Eagan then put him in handcuffs and ushered him back into the police car. Although his movement was somewhat restricted up until that point, his freedom of movement was not curtailed to the degree

18

of a formal arrest.  For example, the car door was clearly unlocked since De LaRosa-Castillo had the ability to (and did) open it, and exit the vehicle during the search.  He was in the car approximately 27 minutes before being given his *Miranda* rights (but some of that time was due to Sgt. Eagan talking with his wife and conducting the search), so this doesn't seem to be overly lengthy. Additionally, Sgt. Eagan was the only officer there, it was broad daylight, and after the initial drawing of his weapon, Sgt. Eagan did not display any weapons or other physical force thereafter.  Sgt. Eagan asked him background questions in a conversational tone, and De LaRosa-Castillo voluntarily answered these questions in an easy going manner.  This situation prior to the search was not a custodial interrogation; therefore, the motion to suppress is denied as to De LaRosa-Castillo's admission that he does not have a license, the car belonged to his cousin, and he is not a legal resident of the United States.

However, there is a time during this incident that De LaRosa-Castillo is placed in custody, and does become subjected to custodial interrogation.  Although it might seem like splitting hairs, this decision about exactly when De LaRosa-Castillo is for all intents and purposes under arrest and is subjected to custodial interrogation is critical in determining which of his statements are admissible and which are not.  In singling out the statements De LaRosa-Castillo made when Sgt. Eagan found the scale box (with the drugs in it) in the trunk, I need to carefully look at the sequence of events.  At minute 23:46 on the dashcam video, De LaRosa-Castillo got out of the squad car to volunteer the information "sir, that's mine," while Sgt. Egan was still some distance ahead of him,

19

at the vehicle in front.  When Sgt. Eagan almost reflexively asked what it was, still from a distance,  De LaRosa-Castillo responded, "it's something illegal, that's mine."  I consider these statements voluntary, and made before De LaRosa-Castillo's movement was restrained.  Statements spontaneously volunteered are not the result of interrogation.  *See, e.g., United States v. Edwards,* 885 F.2d 377, 387 (7th Cir. 1989) ("*Miranda* has never been held to apply to statements voluntarily made by defendants"*); United States v. Lesure*, No. 08-CR-284, 2009 WL 688989, at *8 (E.D. Wis. Mar. 6, 2009).  However, De LaRosa-Castillo was placed in custody when he was handcuffed and put back into the vehicle.  The statement that his wife knew nothing about it, made by De LaRosa-Castillo in response to Sgt. Eagan yelling repeatedly "what is it?" and putting him in handcuffs, was the result of custodial interrogation.  He clearly could not have left the scene at this point in the encounter and his physical movement was completely restrained at this time.

To summarize, all except one of the statements De LaRosa-Castillo moves to suppress were not the result of custodial interrogation, and are therefore admissible.  De LaRosa-Castillo's statements that he does not have a license, the car belonged to his cousin, he is not a legal resident of the United States, the substance found in the trunk belonged to him, and it was something illegal, are all admissible.  But his statement that his wife didn't know anything about it was made after De LaRosa-Castillo was placed in handcuffs and subjected to questioning by Sgt. Eagan.  Therefore, that one statement will be suppressed.  Also, the government has appropriately agreed not to introduce

20

any statements made by De LaRosa-Castillo in response to questions posed by the police after he was read his *Miranda* rights.

### Conclusion

For all of the above-mentioned reasons, the motion to suppress [DE 22] is **DENIED IN PART AND GRANTED IN PART**.  The motion is DENIED as to the drugs found in the vehicle because De LaRosa-Castillo's consent to search the car was freely and voluntarily given; therefore, the evidence seized during the search is admissible.  The motion is also DENIED as to the statements De LaRosa-Castillo made when he was not subject to custodial interrogation, and those statements are likewise admissible.  The motion is GRANTED as to the statement that his wife didn't know anything about it, as this was made after De LaRosa-Castillo was placed in custody and he was subjected to custodial interrogation.

SO ORDERED.

ENTERED: May 20, 2021.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT